**FAITH HOSPITAL ASSOCIATION**

v.

**The UNITED STATES.**

**No. 397–77.**

United States Court of Claims.

Oct. 18, 1978.

Alan C. Kohn, St. Louis, Mo., attorney of record, for plaintiff.

Gerald L. Schrader, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant.

Before COWEN, Senior Judge, and DAVIS and BENNETT, Judges.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

BENNETT, Judge:

In this Medicare provider case, brought under the Tucker Act, 28 U.S.C. § 1491 (1970), the question is whether the medical insurance benefits available under Part B of the Medicare Act permit reimbursement of a sum paid by hospital-based physicians to the hospital for the monopoly it granted them in four specialized departments. Medicare had reimbursed a number of patients for doctors' charges which (it later discovered) included, in addition to the sums paid to and retained by the doctors for their services and to amounts designed to cover departmental operating costs, a further element designed to create profits for the hospital under the cloak of a "donation." The sums attributable to this last element have been recouped for the Medicare trust funds by plaintiff's fiscal intermediary. Plaintiff challenges the recoupments. Defendant prevails.

### I

Plaintiff is a "provider" of services under the Medicare Act, 42 U.S.C. §§ 1395–1395pp (Supp. V, 1975). A nonprofit Missouri corporation, plaintiff operated one Saint Louis hospital in two of the cost reporting periods now in dispute (1966–67 and 1967–68) and two hospitals in the other cost reporting period (1968–69). Plaintiff contends that in 1966 it leased its departments of radiology, pathology, cardiology, and anesthesiology to the doctors who worked in them. According to plaintiff, these hospital-based "physician-specialists" assumed responsibility for the operating expenses of those departments. Plaintiff, which had previously billed for services rendered by those departments along with all other hospital charges, began in 1966 to treat its Medicare patients differently. Separately from the bills reflecting general hospital charges, Medicare patients would receive bills on the letterhead of the group of physicians who are claimed to have operated the four specialized departments. Payments, the bills stated, could be made to the doctors' group or sent to Faith Hospital, which claims it acted as the doctors' "collection agent." The proceeds of the billings for the physicians' serv-

ices were divided three ways: a fixed percentage of the amounts billed were allocated to the doctors as their remuneration; the hospital used some of the receipts to offset the operating costs of the departments; and the remainder, characterized by plaintiff as the "donative element," was retained by the hospital for use as it saw fit. Medicare's Part B reimbursed the patients for 80 percent or 100 percent[1] of the amounts they had paid to plaintiff.

This dispute began when plaintiff's fiscal intermediary balked at plaintiff's arrangement with its specialists. In the course of reviewing plaintiff's cost reports, the intermediary determined that plaintiff retained Medicare reimbursements which exceeded the amount to which it was entitled. Its decision rested on the understanding that Medicare's total reimbursement should cover an appropriate share of the operating costs plus a reasonable and customary fee for the physicians' charges. No additional sum constituting a hospital profit was, the intermediary reasoned, allowed by the Medicare statute and regulations. This determination was upheld by a unanimous decision of the Blue Cross Association Provider Appeals Committee and then by a review officer appointed by the Secretary of Health, Education, and Welfare (the Secretary).[2] Plaintiff's suit here followed.

Plaintiff contends it was entitled to retain all the Medicare funds it received under its arrangements with its doctors. Its attack on the recoupment relies primarily upon two sentences of a single regulation, for interpretation of which plaintiff relies on a subsequently vacated decision of a circuit court of appeals. Plaintiff argues that the focus must be on the reasonableness of the total amount billed and implicitly asserts defendant and its agents may not look through the form of the transaction to analyze its substance. Plaintiff supposes that the overall reasonableness of doctors' charges precludes inquiry into the amounts which indirectly proceed from Medicare funds to the hospital.

Defendant asks that we approve the recoupment on the grounds that Medicare payments may not recompense a hospital, directly or indirectly, for services it has not provided. Under defendant's view, plaintiff was entitled merely to receive payments reflecting its actual expenses, and a recoupment became necessary when the doctors' charges proved to include a forbidden element of profit for the hospital. As this dispute comes to us, the issue is narrow:[3] must Medicare pay not only the fee earned and retained by the physician-specialist and a share of the hospital's operating expense but also an additional sum paid by the doctors to the hospital for the privilege of having a monopoly there within their areas of specialty? That the statute and regulations do not permit such payments is confirmed by analysis.

## II

As is well known, Medicare consists of two complementary programs, which we shall describe only generally. Part A,

---

1. Under the Medicare Act's Part B, discussed *infra*, 80 percent of many medical and health service charges and 100 percent of some others are reimbursable. 42 U.S.C. §§ 1395k(a), 1395*l* (a) (1970).

2. The final administrative determination by the Secretary was ordered by the Eighth Circuit Court of Appeals. *Faith Hosp. Ass'n v. Blue Cross Hosp. Serv.*, 537 F.2d 294, *cert. denied*, 429 U.S. 977, 97 S.Ct. 484, 50 L.Ed.2d 584 (1976).

3. Plaintiff has now yielded arguments which it earlier pressed with vigor. It had argued administratively that the recoupments could be made, if at all, only from the patients (who had received the Medicare payments directly) and not from the hospitals, but it has not asserted in this court that the question of who received the check from Medicare, rather than who ultimately got the money, is material. Plaintiff also has relinquished its contention that monies at stake represented donations from the doctors to the hospitals; at oral argument plaintiff's counsel agreed that these sums represented payments by the doctors for their monopoly at the hospital and, from the hospital's perspective, could be fairly termed a profit. This latter concession makes it unnecessary to consider the fact that some of the doctors evidently claimed charitable deductions on their federal income tax returns for the "donations" to the hospital.

sometimes called the "basic plan," provides substantial protection against the costs of hospital and related post-hospital services. 42 U.S.C. § 1395c (1970). Its benefits are enjoyed without charge by persons over 65 years of age or, as a result of statutory amendment (which occurred after the years here in dispute), meeting specified criteria concerning disability. 42 U.S.C. § 1395c (Supp. II, 1972). Part B differs in several respects. This "supplemental plan" is a voluntary program of insurance, requiring the payment of periodic premiums, and its focus is on the costs of physicians' and other medical and health services. 42 U.S.C. §§ 1395j, 1395k (1970). Part B coverage requires the payment of periodic premiums, eligibility for citizens and permanent resident aliens being dependent on age or entitlement to Part A benefits. 42 U.S.C. § 1395o (Supp. II, 1972). Each part is separately financed, and a separate trust fund has been established for each. Part A depends on the Federal Hospital Insurance Trust Fund, which includes revenues derived in large measure from payroll and self-employment taxes. 42 U.S.C. § 1395i (1970). Part B's funds are administered through the Federal Supplementary Medical Insurance Trust Fund, a fund generated mainly by the premiums paid by those who have elected to enroll. 42 U.S.C. §§ 1395s, 1395t (1970). Government appropriations are a further source of Medicare revenues. 42 U.S.C. §§ 1395i-1, 1395w (1970).

Numerous regulations have been adopted to flesh out the statutory plan.[4] One group of these regulations has been identified by both parties as being of particular relevance to this case. The regulations to which so much attention is directed are found at 20 C.F.R. §§ 405.480–405.488 (1968).[5] These regulations, addressing the issues relating to reimbursement for medical expenses involving hospital-based physicians, are both lengthy and complex. Plaintiff's argument depends heavily on the regulations, particularly upon the first sentence of section 405.-486(a) and the second sentence of section 405.486(b)(1). It is worth quoting them in context, with the parts on which plaintiff relies appearing in italics:

§ 405.486. Effect of physician's assumption of operating costs.

(a) *Principle. Where a hospital-based physician himself bears some or all of the costs of operation of a hospital department and bills his patients directly rather than through the hospital, the reasonable charges for his services recognized under the supplementary medical insurance program will reflect the costs so borne by him.* Where all the costs are to be borne by the physician, charges heretofore established for such services by agreement between the physician and the hospital may be acceptable as reasonable charges for purposes of the supplementary medical insurance program, but they will require adjustment either upward or downward if the hospital has been bearing a cost significantly greater or less than its share of the proceeds of such charges.

(b) *Billing for physician services.* (1) The objective in determining reasonable charges where the physician bills patients directly is the same as that expressed in § 405.485(a); to bring about as little change as possible (in the normal case) in the compensation the physician receives for his services in the hospital. *Where the physician bills the patient directly, costs of operating the hospital department which are borne by the physican* [sic] *will be reflected in his reasonable charges which are compensable under the supplementary medical insurance program;* the hospital will receive reimbursement through the hospital insurance program for those costs, if any, which it incurs. Where, however, a hospital ini-

---

**4.** Section 1874 of the Social Security Act, 42 U.S.C. § 1395kk (1970), designates the Secretary of Health, Education, and Welfare as the federal executive officer responsible for the administration of the Medicare program. Pursuant to 42 U.S.C. § 1395hh (1970), the Secretary has issued regulations to implement the program. 20 C.F.R., ch. III, pts. 405, 422.

**5.** For convenience, we use the 1968 C.F.R. Subsequent references to regulations in 20 C.F.R. will be by section number only.

tially pays some or all of the operating expenses of a hospital department (e. g., pays the salaries of nonprofessional personnel and purchases supplies and equipment), even though subsequently those items and services for which it pays the operating expenses are furnished for the use of the physician in return for an agreed upon payment by the physician to the hospital, such operating costs are reimbursable under the hospital insurance program as hospital costs, and are not to be reflected in the reasonable charges of the physician. Any payments received by the hospital under such an arrangement shall be treated as a reduction of allowable costs of the hospital reimbursable through the hospital insurance program.

(2) Where a hospital has been receiving, as its portion of the receipts for such services, significantly more or less than the costs the hospital has incurred in the provision of the services, this excess or shortage should not be transferred from the hospital to the physician merely because he decides to bill his patients directly. Since payment to the hospital is made on the basis of its reasonable costs for all hospital services, the transfer of such excess or shortage to the physician necessarily would alter the total cost of patient hospital and medical care—a result which the legislation was not intended to bring about. The reasonable charges of a physician who enters into a lease or similar arrangement with a hospital under which the physician assumes the costs of operating the department and bills the patients directly would be based upon the remuneration he received for his services immediately prior to the leasing arrangement plus his reasonable costs of operation, taking into account the hospital's cost experience in providing such services. Reasonable charges, so determined, would be subject to appropriate future adjustment to take into account

charging economic factors. Reference back to the remuneration formerly received by the physician from the hospital as a factor in determining his reasonable charges under the lease or similar arrangement is required to give effect to the provisions of the statute which direct that consideration be given, in determining reasonable charges, to the customary charges generally made by the physician for similar services. Where no pattern of customary charges has been established for the physician's professional services to patients other than the compensation he received from the hospital for his services, such compensation would serve as the basis for establishing the customary charge.

Plaintiff reads the italicized portion of the paragraphs just quoted to authorize the inclusion in the doctors' charges of an element designed to compensate the hospital for the monopoly it granted to the doctors in their respective areas. At the same time plaintiff argues that the regulation's only limits on the arrangements which may be made between doctors and hospitals is to preclude "double billing," whereby Medicare would be caused to recompense the same expense twice (once each under Parts A and B). For this latter point, plaintiff relies almost exclusively on a now-vacated decision of the Fifth Circuit. That court had stated that section 405.486 "exists to insure that Medicare does not pay twice for the same operating costs." *Dr. John T. MacDonald Foundation, Inc. v. Mathews*, 534 F.2d 633, 637 (5th Cir. 1976). That decision has since been vacated by the Fifth Circuit, en banc, on jurisdictional grounds and the case was transferred here for disposition on the merits. 571 F.2d 328 (5th Cir. 1978). It thus cannot serve as a precedent of any substantial value. Nor are there other authorities which offer plaintiff much support.[6]

---

**6.** Plaintiff relies on a recent decision in the D.C. District Court, *Lodi Memorial Hosp. v. Califano*, 451 F.Supp. 651 (1978), while defendant draws strength from *Vallejo Gen. Hosp. v. Weinberger*, No. C–75–1444 (N.D.Cal. Feb.

9, 1977). The former supplies little independent analysis but instead closely follows the *MacDonald* case; the abundant quotation of that subsequently withdrawn opinion deprives the *Lodi* opinion of much force, as does the

We find plaintiff's reliance on these regulations misplaced and its construction of them seriously flawed. In the first place, neither of the sentences in section 405.486 on which plaintiff relies can properly be read as authorizing the inclusion in Medicare reimbursement for physicians' services of an amount designed to compensate the hospital for awarding monopoly position with respect to certain departments to a group of doctors. The two sentences relied on by plaintiff address themselves merely to the question of reimbursement of *operating costs* of the departments. Such costs have been reimbursed by Medicare indirectly through the patients and have not been made an issue here, since no recoupments were attempted of such sums.[6a]

In the second place, plaintiff's analysis of these complex regulations attributes to the drafters of the regulations an intent to convert a straightforward proposition into an incomprehensible jumble. The problem is that plaintiff will not acknowledge that the provisions just quoted have any purpose other than the avoidance of "double billing," whereby Medicare would be caused to recompense the same expense twice (once from Part A and once from Part B). Yet it is obvious to us that the regulation in question has purposes beyond the one conceded by plaintiff.

The regulation is far more complex than necessary to deal with such a narrow problem as double billing, and a careful reading of the regulation shows its effect to be broader than plaintiff suggests.

We agree with defendant that section 405.486(b)(1) permitted the recoupment made here from plaintiff. The complexity of the language selected and the awkwardness of the drafting do not obscure its clear mandate: the hospital may not receive Medicare payments exceeding its operating costs merely because the doctors acquire responsibility for operating the departments. The Medicare trust funds were intended to be secure against the use of trifling changes in form to justify large changes in result. In the absence of an arrangement transferring responsibility for operation of the departments to the doctors, the hospital would be entitled to retain payments from Medicare sufficient only to pay for the services furnished by the hospital. Transfer of operational responsibility for a department to the doctors cannot possibly justify increasing the Medicare proceeds retained by the hospital.

The regulation thus serves to determine in which situations the costs of operating the hospital departments will be reimbursed under Part A and when they will be reimbursed under Part B. But it simply does not permit, and in fact prohibits (although implicitly), the inclusion in physicians' charges of additional sums constituting a monopoly payment or profit to the hospital. This construction of the regulation is supported by other provisions in the same group.

One provision, which defendant inexplicably ignores, is paragraph (b)(2) of the same regulation. This paragraph reinforces the directive of (b)(1) that hospitals must not receive sums greater than the actual costs which they bear. Paragraph (b)(2) makes it clear that where a physician takes over operation of a hospital department, his charges will be reimbursable only to the extent justified by the remuneration he received immediately prior to the leasing arrangement plus his reasonable costs of operation. The payments to the hospital for the monopoly enjoyed by the doctors cannot be

---

focus there on the question of whether the alleged excesses of Medicare reimbursements had in fact found their way into the provider's treasury. Here, by contrast, there is no denial that the asserted overcharges ultimately accumulated to plaintiff's benefit rather than remaining with the patients or doctors. The *Vallejo* case appears better reasoned and factually more analogous to the case at bar than does *Lodi*.

**6a.** It is true that a Part A intermediary recouped the funds which had been paid under Part B. This adjustment, seemingly approved by the last sentence of section 405.486(b)(1), does not affect plaintiff's entitlement to money damages and so does not require us to evaluate it for compliance with the statutory intent.

said to have been reflected in the amounts previously paid to the doctors, nor are such charges properly included in the "reasonable costs" of operation.

Other support for defendant's position is also abundant.

■ The statutory scheme and the regulations which implement the statute's goals evidence a clear purpose to limit the payments made from Medicare funds to reasonable amounts for the services rendered. 42 U.S.C. §§ 1395f(b), 1395*l* (1970); § 405.401. No payments under Medicare are permitted for items or services "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y (1970). The statute requires the Secretary to adopt regulations designed to limit payments to the reasonable costs of Medicare services, and those regulations were required to permit the retroactive adjustment of reimbursements which proved either inadequate or excessive. 42 U.S.C. § 1395x(v)(1)(A) (1970). The courts have held mandatory the duty to make retroactive corrective adjustments, despite the Secretary's failure to adopt regulations with sufficient corrective scope. *See Appalachian Regional Hospitals, Inc. v. United States,* 217 Ct.Cl. ——, ——, 576 F.2d 858, 866–67 (1978), and cases there cited. Administration of the statutory scheme involved a large role for organizations (such as Blue Cross-Blue Shield) whose responsibilities as "fiscal intermediaries" (Part A) and "carriers" (Part B) place them between providers and the Social Security Administration. These organizations play diverse roles, of which the most important may be to determine the reasonableness of the charges and costs and of the amounts of payments to be made from Medicare funds. 42 U.S.C. §§ 1395h, 1395u (1970); § 405.501. *Cf.* § 405.801.

The reasonableness of the intermediary's action becomes even more apparent when attention is focused on two peculiar aspects of the arrangement between plaintiff and its doctors. One curiosity involves plaintiff's continued insistence that the doctors leased the departments from the hospital, despite ample evidence to sustain the contrary findings of each of the Secretary's representatives. The other feature worthy of mention is the discrepancy in billing practices as between Medicare and non-Medicare patients.

With regard to the former, the intermediary explicitly found that the departments were operated by Faith Hospital until December 1, 1970. The Provider Appeals Committee implicitly, but undoubtedly, agreed, stating that the doctors received their compensation from the hospital. The Secretary's review officer echoed these findings, holding that it was the hospital, not the doctors, which initially incurred departmental operating costs.[7] Admittedly, a portion of the doctors' billings was used to reimburse the hospital for the main expenses incurred in operating the departments. But the employees of the departments were hired by, responsible to, and paid by the plaintiff. Also, the hospital purchased and owned the supplies and equipment used in the departments. Significantly, the risk of bad debts remained with the hospital, since the doctors' compensation was determined as a percentage of charges billed, not collected. Moreover, the tax forms 1099 which plaintiff issued to the doctors revealed that plaintiff regarded the doctors as having earned only the sums actually retained by them after the transactions were closed; they did not base the statement of earnings on the same assumptions argued here, *i. e.,* that the doctors'

7. Plaintiff has attempted to obscure the economic substance of the arrangement by focusing on a $5000 "payment" from the doctors to the hospital at the time billing practices were changed in 1966. Its evident purpose was to permit the argument that operating expenses were being "initially incurred" by the doctors (so long as reimbursements for expenses of the hospital were prompt enough to leave the doctors with a positive balance). Of course, even if the $5000 had actually been paid by the doctors, rather than drawn from previous "donations," operational responsibility still could not be said to have been assumed by the doctors.

compensation constituted the amount billed minus expenses of operating the departments. These facts, none of which are challenged by plaintiff, provide substantial evidence to support the conclusion of the Secretary that the doctors were not operating the departments during the years in question.[8] This, in turn, robs a key argument by plaintiff of any substantial force. That argument sought to establish the reasonableness of the accounting practices here in question by analogizing to the situation of a doctor whose practice was centered in a private building rather than a hospital. The rent paid by the doctor would be part of his or her operating expenses and could properly be reflected in the charges to patients, even though the rent would include profit for the landlord. But defendant points out that the hospital context differs from that of a privately owned building. Private landlords, unlike plaintiffs here, do not ordinarily guarantee that tenants will collect their billings, nor are they likely to furnish medical equipment and assume responsibility for supplying support staff. More importantly, in the hospital context we must not ignore the role of Part A, the hospital insurance plan. The measure of a hospital's share must be limited (under Part B as well as Part A) to the costs it incurs and must be reviewed for reasonableness by the intermediaries and carriers designated pursuant to statute.

The other fact which cannot be overlooked is that plaintiff and the doctors worked out one arrangement for billing Medicare patients and a different method of billing non-Medicare patients. Plaintiff explains that the different billing methods developed because the physicians thought it "more professional" to bill their patients "directly" but that the hospital resisted because it had found that Blue Cross-Blue Shield members would generally receive more coverage for the same charges when they were billed through the hospital than if they had been billed through the doctors. A "compromise" was reached, retaining the old billing method which had ensured the maximum third-party liability for non-Medicare patients. Non-Medicare patients were billed by the hospital, with no segregation of the costs for physicians. A different system was adopted for Medicare patients which was again designed to see that maximal reimbursements were derived from a third party, in this case the Medicare trust funds. Under this plan, Medicare patients were billed "directly" by the doctors. Actually, the bills were sent out by the hospital, to whom patients generally sent their payments, but bills went out under the physicians' letterhead and the hospital's acts in billing were purportedly done as agent for the doctors.

The factual considerations just discussed make it even more clear that plaintiff cannot prevail. We have already shown that the regulation cannot support the hospital's collection of payments for monopoly privileges even if there was assumption by the doctors of responsibility for operation of the departments. The facts just discussed show that plaintiff cannot even establish that such responsibility was assumed, for the regulation read as a whole permits Part B to assume responsibility for Part A-type expenses only where there has been an actual lease or some other arrangement by which responsibility was transferred. Who does the billing is not material, nor is there any reason to be sidetracked by the question of whether the doctors provided an advance to the hospital against operating expenses from their own funds or from funds which they had already "donated" to the hospital. These factual issues can be bypassed because no matter how they are resolved plaintiff simply has no claim deserving relief here. The problem plaintiff faces is that, despite the policy against federal interference in doctors' and hospitals' affairs, the statutory scheme is offended by the structuring of hospital-doctor relationships in such a manner that changes which exist in name or form only result in substantial differences in the amounts to be reimbursed and the funds from which they should be reimbursed.

---

8. A different arrangement between plaintiff and the doctors was begun in 1970, but no dispute growing out of that arrangement is before us now.

Quite simply, the Medicare program is designed so that, in the case of services rendered by, say, an anesthesiology department or radiology department, the reimbursement from Medicare funds will do no more than reimburse the actual operating costs of the hospital, including the reasonable expense incurred in paying the hospital physicians. Plaintiff, by changing the form, but not the substance, of the relationship between the hospital and the doctors in the departments, would have Medicare's obligation change to permit reimbursement not only of the operating expenses of the hospital and of the monies paid to and retained by the doctors but also a profit factor charged by the hospital as its fee for granting the doctors a monopoly in their areas of specialization. Such an excess charge is obviously inimical to the statute's purposes, and a regulation which purported to allow it would be suspect. As we have seen, no regulation even purports to grant the authority which plaintiff's contentions require.[9]

### III

Although we agree with defendant's theory of the case, we do not dismiss plaintiff's petition. It is apparent that the recoupment which was made from plaintiff was excessive, for the computation of the so-called donative element was made on the basis of amounts billed, not amounts collected. The hospital, as we have already indicated, bore the risk of and liability for nonpayment of billings. The Secretary's review officer stated that this resulted in excessive recoupment, and defendant's counsel acknowledged at oral argument that it would be appropriate for the court to retain jurisdiction until the adjustments necessitated by this error can be resolved. In this limited sense only has plaintiff established entitlement to a judgment on liability. We would doubt that proceedings before the trial judge would be necessary, since this accounting matter should lend

itself to amicable and objective resolution. Nonetheless, the good offices of the trial judge remain available should the parties be unable to adjust their differences consensually. Judgment is entered for defendant on the issue of liability, subject to the aforesaid adjustment, and the case is remanded to the trial division for such additional proceedings as necessary in connection therewith. Plaintiff's motion for summary judgment is denied and defendant's cross-motion is allowed with the qualification just indicated.

**9.** In view of the compelling case established for defendant, we have no need to consider the provision in the Provider Reimbursement Manual which defendant cites. We much prefer to rest our analysis on statutes and regulations. *Cf. Jankowitz v. United States,* 533 F.2d 538, 543 n. 3, 209 Ct.Cl. 489, 497 n. 3 (1976).