**SACRED HEART HOSPITAL**

v.

**The UNITED STATES.**

No. 357–77.

United States Court of Claims.

Feb. 20, 1980.

Leonard C. Homer, Baltimore, Md., attorney of record for plaintiff. Merlin H. Staring, Washington, D. C., and James C. Lanshe, Sr., Allentown, Pa., of counsel.

Gerald L. Schrader, Washington, D. C., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D. C., for defendant. Leila H. Carp, Columbia, Md., of counsel.

Before COWEN, Senior Judge, and KUNZIG and SMITH, Judges.

ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT

KUNZIG, Judge:

The general question presented to this court here is the appropriate amount of money owed plaintiff for administration of its inhalation therapy department under the Medicare program. Specifically, defendant

contests this court's jurisdiction over the matter and plaintiff argues that defendant's actions are not in accordance with law. For the reasons stated below, we hold that this court has jurisdiction over these claims and that defendant's actions were arbitrary and capricious and contrary to law.

Plaintiff is a non-profit general hospital providing services under the Medicare program. 42 U.S.C. § 1395x (1976). In 1966, plaintiff, Sacred Heart ("Provider") filed an agreement with the Secretary of Health, Education and Welfare (HEW) entitling it to the reasonable cost of covered services it furnished to program beneficiaries. *Id.* at § 1395cc. Plaintiff chose Blue Cross Association (BCA) to act as its fiscal intermediary under the Medicare Act. *Id.* at § 1395h. BCA, in turn, subcontracted with Blue Cross of Lehigh Valley ("Plan") to service plaintiff hospital. Under the agreement with HEW and 42 U.S.C. § 1395h, BCA and the Plan were required to determine those reasonable amounts of Medicare reimbursement due to providers of services and make such payments.[1] As such, BCA and the Plan were agents of the Government—the "perennial defendant" in our court. *See Overlook Nursing Home, Inc. v. United States*, 556 F.2d 500, 501, 214 Ct.Cl. 60, 63 (1977).

Plaintiff submitted its costs for providing benefits to Medicare patients to the Plan which reviewed those costs as required. The Plan, acting on behalf of BCA and HEW, disallowed a substantial portion of Sacred Heart's administrative costs for its inhalation therapy program for 1967 through June 30, 1973.[2] All told, the Plan disallowed $69,914.00.[3]

The hospital appealed the Plan's determination to BCA's Chief Hearing Officer who reversed the decision. He first reviewed the history of plaintiff's inhalation therapy department. The department's purpose is to diagnose and care for patients with respiratory problems including services such as blood gas analysis, pulmonary function studies and administration of oxygen, humidity and medications. Patients range from outpatients with mild respiratory problems to those under continuous respirator care. In the hospital as a whole, about one-third of all patients were Medicare patients.

Prior to 1963, Sacred Heart had only limited inhalation therapy services available. The department, as such, consisted of a non-certified therapist and a technician who were trained to administer oxygen and operate pressure machines. In 1963, however, the hospital entered into an agreement with a board-certified anesthesiologist to administer its inhalation therapy program. The physician administrator originally was to receive 30% of the department's gross receipts but, at the insistence of the Plan, that was revised to 20%. Under the physician-administrator, the department has grown to eight full time, board certified anesthesiologists, nine trained technicians, two therapists and two registered therapists. The physicians' group receives 20% of the gross departmental receipts. For

---

1. The operation of the Medicare programs is explained more fully in *Overlook Nursing Homes, Inc. v. United States*, 556 F.2d 500, 214 Ct.Cl. 60 (1977); *Ulman v. United States*, 558 F.2d 1, 214 Ct.Cl. 308 (1977) (see particularly note 3 explaining the intermediary's function); *St. Elizabeth Hospital v. United States*, 558 F.2d 8, 214 Ct.Cl. 322 (1977). We also note that the regulations under discussion herein were previously located at 20 C.F.R. They are now contained in 42 C.F.R. to which we shall refer.

2. Sacred Heart switched from a calendar year accounting period to a fiscal year period ending June 30 each year beginning in 1972.

3. Based upon the apportionment principles in 42 C.F.R. § 405.452 (1978), the Plan disallowed all administrative costs above $10,000 per year. Specifically, plaintiff was denied the following amounts: 1967—$6,501.00; 1968—$7,919.00; 1969—$9,718.00; 1970—$10,373.00; 1971—$11,230.00; 6/30/72 fiscal year—$7,657.00; 6/30/73 fiscal year—$16,516.00. Totalling $69,914.00.

The $10,000 per year allowed was determined by the Plan by comparing Sacred Heart to other hospitals with a similar number of beds. The most comparable hospital in terms of bedsize had administration costs of approximately $10,000 per year. Plaintiff complains that it has not even received this "allowable" amount yet in reimbursement.

Medicare purposes, however, 25% of those receipts are considered to be for patient services and analyzed under that category. Thus, the actual fixed administrative cost of the program is 15% of gross receipts.[4]

In reviewing the reasonableness of plaintiff's administrative costs, the Plan had surveyed the administrative costs at other hospitals of comparable bed capacity and determined that $10,000 was the maximum reasonable administrative cost for a hospital of Sacred Heart's size. The Chief Hearing Officer was concerned, as we are upon review, that the Plan initially compared *apples with oranges.* There was no evidence that the cost of services correlated with the number of beds in a hospital.[5] Consequently, he asked for further information regarding hospitals with similar numbers of inhalation therapy procedures.

Upon reviewing the Plan's survey of other hospitals in the region, the Chief Hearing Officer found:

> [T]he Provider had the largest inhalation therapy department, in terms of number of procedures, in its area . . . the Provider's cost per procedure was the

lowest in the region. The cost per procedure of the administration of the inhalation therapy department was not out of line with costs for other institutions. While it is true that gross physician administration costs, as a percentage of gross inhalation therapy costs, was higher for this institution, the Hearing Officer concludes that this fact alone does not make the cost unreasonable. On a per procedure basis, the Provider's administration costs align with those of comparable area hospitals. The fact that the appealing *provider provides the least expensive inhalation therapy rate in its area further supports a finding of reasonableness.* In conclusion, the Hearing Officer finds that the evidence submitted does not support the Plan's determination that the Provider incurred unreasonable costs for the administration of its inhalation therapy department during the periods in question, when those costs are compared to similar institutions in the region in relation to services rendered. [Emphasis added.] [6]

4. A review of the hospital's inhalation therapy costs shows that 28% of the costs are administrative. *See* note 6 *infra.* The parties have not entirely explained this discrepancy. A portion is because some non-administrative costs in physician services were included in this category. We assume that other services are included here also. Moreover, the dispute here is only over the reasonableness of the administrative costs paid to physicians. Since the Chief Hearing Officer found the "high" 28% figure reasonable, and we agree with him, we need not concern ourselves with how much lower this figure should be.

5. For one thing, the hospital provided outpatient services, which could account for a substantially larger inhalation therapy department. Secondly, if the hospital had a modern and complete inhalation therapy program in comparison to other hospitals, seemingly, a higher proportion of in-patients would be there for inhalation therapy than in other hospitals. Finally, if Sacred Heart's procedures cost substantially less, as the evidence shows, doctors might refer more cases to plaintiff and more cases that might forego treatment elsewhere.

6. The data which the Plan provided is summarized in the following table:

|  | Sacred Heart | Provider A | Provider B | Provider C |
|---|---|---|---|---|
| No. of inhalation therapy procedures | 193,083 | 54,956 | 28,514 | 20,892 |
| Total revenues | 340,058 | 642,574 | 379,683 | 175,483 |
| Total costs | 176,705 | 181,636 | 129,155 | 62,865 |
| Total costs (exclusive of administration costs) | 126,030 | 169,396 | 121,903 | 52,865 |
| Physician compensation for administration | 50,675 | 12,240 | 7,252 | 10,000 |
| Physician compensation for administration (as a % of total cost of inhalation therapy department) | 28.7 | 6.7 | 5.6 | 15.9 |

Subsequently, HEW's Social Security Administrations's Bureau of Health Insurance (BHI) reviewed the Chief Hearing Officer's decision and directed him to reopen and revise his decision "without placing emphasis on the cost per amount of procedure." BHI considered the hearing officer to have failed to evaluate the case properly under the prudent buyer policy HEW used to keep costs reasonable. The Bureau's reasoning was:

We do not believe that a "per procedure" basis is a valid measure for evaluating the administrative costs of a department. While the number of procedures may indicate variations in the size of inhalation therapy departments, which in turn may require differing degrees of administration, *there is no indication to show that this relationship is proportional;* that is, where one department has twice the number of procedures as another, it does not follow that the administrative costs need be in a two to one ratio.

*A more accurate comparison of the administrative costs of inhalation therapy departments could be obtained by securing information on facilities with similar-sized inhalation therapy departments in accordance with the Medicare program's prudent buyer policy. This comparison should be made in terms of the number of employees, their skill levels, the number of patients in the facilities, the total costs of operating the department* (exclusive of those administrative costs being questioned), *and the sophistication of the services given.*

It seems improper that the administrative compensation for the inhalation therapy department of the provider (a 289-bed hospital), amounted to over $67,000, whereas for the other hospitals, the costs ranged from $7,252–$12,240, the largest hospital in the comparison group (525 beds), having total costs (exclusive of administration costs) exceeding that of the provider, and serving a larger patient population, but having administrative compensation costs of only $12,240. [Emphasis added.]

The Chief Hearing Officer allowed plaintiff to submit further evidence before revising his opinion. Sacred Heart's evidence went to the propriety of the per unit cost basis of the prior decision and further explication of the range of administrative functions the physicians performed. Laboring under the constraints of BHI's directives, however, the Chief Hearing Officer reluctantly concluded that the hospital had failed to meet its burden of proof and the Plan's decision as to the reasonableness of Sacred Heart's inhalation therapy administrative costs must stand.[7] Plaintiff then timely appealed that decision to this court.

| Cost per procedure (exclusive of administration costs) | Sacred Heart | Provider A | Provider B | Provider C |
|---|---|---|---|---|
| | .65 | 3.08 | 4.28 | 2.53 |
| Cost per procedure for administration | .27 | .23 | .25 | .47 |
| Total Cost Per Procedure | .92 | 3.31 | 4.53 | 3.10 |
| See also note 4 supra. | | | | |

7. The Chief Hearing Officer's decision read, in part:

In its letter the Social Security Administration directed that the comparison between this Provider's inhalation therapy department and those of other institutions be made in terms of "number of employees, their skill levels, the number of patients in the facilities, the total cost of operating the department (exclusive of those administrative costs being questioned), and the sophistication of the services given." While the Hearing Officer appreciates the concerns of the Social Security Administration of an undue emphasis on unit of cost as the basis for making reasonable cost determinations, he concludes that a qualitative analysis of the administrative services in this Provider's or any provider's

## I.

Defendant once again challenges this court's jurisdiction over a portion of this Medicare case. As to the years 1967 through fiscal year 1972, defendant apparently finally accepts this court's jurisdiction under 28 U.S.C. § 1491 (1976). *See Gosman v. United States*, 573 F.2d 31, 34, 215 Ct.Cl. 617, 621–22 (1978); *St. Elizabeth Hospital v. United States*, 558 F.2d 8, 214 Ct.Cl. 332 (1977); *Whitecliff, Inc. v. United States*, 536 F.2d 347, 349–51, 210 Ct.Cl. 53, 56–58 (1976), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977). For the cost period ending June 30, 1973, however, defendant argues that since plaintiff claims more than $10,000, 42 U.S.C. § 1395oo (1976) now requires plaintiff to bring its claim before the new Provider Reimbursement Review Board (PRRB) and subsequent review in the district courts.

In 1972, Congress enacted 42 U.S.C. § 1395oo (1976) and directed HEW to set up the PRRB to review provider complaints of intermediary's cost determinations. Ultimately, review of PRRB decisions was to be to the district courts. As we explained in *Appalachian Regional Hospitals, Inc. v. United States*, 576 F.2d 858, 217 Ct.Cl. 1 (1978), however, we are restricted in our ability to transfer cases to the district courts, 28 U.S.C. § 1506 (1976), and need not always do so where their jurisdiction is not exclusive. *Id.* at 13, 576 F.2d at 864.

In this case, plaintiff presents a compelling argument. When Sacred Heart sought review of the Plan's decision in 1974, HEW had not yet formed the PRRB. Thus, plaintiff requested and received full administrative review under the existing procedures. Subsequently, the PRRB was formed and now defendant insists that plaintiff resubmit its decision to the PRRB for further administrative review and later review in the district court.

In our view, plaintiff exhausted its administrative appeals as they existed for it when it challenged the Plan's decision in 1974. At that point, review by this court is well-established. *Gosman v. United States*, *supra*. We have recently reached a similar result in relation to the Merit Systems Protection Board. *See Gurland v. United States*, No. 391–77 (order, Dec. 14, 1979); *Gaskins v. United States*, No. 5–79 (order Oct. 23, 1979). *Accord, Appalachian Regional Hospitals, Inc., supra*. Thus, we do not consider this situation to be within the exclusive jurisdiction of the district courts.

Moreover, we see neither purpose nor common sense in remanding this case to the PRRB in light of our decision on the merits. First, we are presented with the same issue in regard to all the years. If the Plan's decision is proper as to 1972, it is proper as to all. Second, since we determine that the hearing officer's original decision was not reversible by BHI, it would not be reversible by the PRRB. *Infra*. Hence, in the interests of judicial economy alone, the 1973 portion of this case is best considered here.

## II.

We now turn to the propriety of the substantive decisions made by BCA and the Chief Hearing Officer.

inhalation therapy department is not practical. Neither the Hearing Officer nor the Plan (and very likely not even the Social Security Administration itself) are qualified to analyze the technical, medical aspects of the administrative services which were provided to this Provider's inhalation therapy department by the anesthesiologists group. Thus, it is likely that, even if the Provider had offered such evidence, the Hearing Officer would not have been in a position to have meaningfully evaluated it. However, the Provider did not submit such evidence, except in the bare assertion of the physician who headed the anesthesiologists group that the services of his group provided were qualitatively better than the services of physician administrators of inhalation therapy departments in other area hospitals provided. Since the Hearing Officer is precluded from making findings of reasonable cost on the basis of a cost per unit or procedure, he has no alternative but to conclude that the costs which the Provider incurred to acquire administrative services for its inhalation therapy department were unreasonable in amount. Accordingly, the Plan's initial adjustments are reinstated.

■ Our scope of review in these Medicare cases is well settled. The court is limited to reviewing decisions by a hearing officer and intermediary "for compliance with the Constitution, statutory provisions, and regulations having the force and effect of law, as well as for the taint of arbitrariness, capriciousness, or lack of support in substantial evidence." *Gosman v. United States,* 573 F.2d 31, 34, 215 Ct.Cl. 617, 621–22 (1978); *St. Elizabeth Hospital v. United States,* 558 F.2d 8, 11–12, 214 Ct.Cl. 322, 326–27 (1977); *Whitecliff, Inc. v. United States,* 536 F.2d 347, 349–51, 210 Ct.Cl. 53, 56–58 (1976), *cert. denied,* 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977). Plaintiff complains that the BCA and Chief Hearing Officer's decision were not in accordance with the Medicare statutes, HEW regulations or supported by substantial evidence.

We start with the governing statutes. 42 U.S.C. § 1395f(b) provides the basic reimbursement rule. That section directs that a provider such as Sacred Heart be paid for its services the lesser of "the reasonable cost of such services, as determined under [42 U.S.C. § 1395x(v)]," or those services' customary charges. Neither party contends that an issue exists as to customary charges, rather, the issue is whether plaintiff's inhalation therapy program administrative costs were reasonable under 42 U.S.C. § 1395x(v) (1976). This latter section provides that reasonable costs are those costs "actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services." Section 1395x(v) also provides direction to the Secretary in the promulgation of the relevant regulations. It allows the Secretary to consider:

[T]he principles generally applied by national organizations or established prepayment organizations (which have developed such principles) in computing the amount of payment, to be made by persons other than the recipients of services, to providers of services on account of services furnished to such recipients by such providers. Such regulations may provide for determination of the costs of services on a per diem, per unit, per capita, or other basis . . . .

In response to the Medicare legislation's directives, the Secretary promulgated regulations outlining the reasonable costs principles. Those regulations provide, in pertinent part:

(a) *Principle.* All payments to providers of services must be based on the reasonable cost of services covered. . . . Reasonable cost includes all necessary and proper costs incurred in rendering the services, subject to principles relating to specific items of revenue and cost

. . . . .

\*      \*      \*      \*      \*      \*

(c) *Application.* . . .

(2) The costs of Providers' services vary from one provider to another and the variations generally reflect differences in scope of services and intensity of care. The provision in Title XVIII of the Act for payment of reasonable costs of services is *intended to meet the actual costs, however widely they may vary from one institution to another. This is subject to a limitation where a particular institution's costs are found to be substantially out of line with other institutions in the same area which are similar in size, scope of services, utilization, and other relevant factors.* [42 C.F.R. § 405.-451 (1979) (emphasis added).]

■ As a reading of the statute and regulations indicates, the intent in reimbursement is to allow a provider its actual costs. In order to protect the federal financial interest, however, HEW is allowed to impose reasonable limitations. In this case, the Plan determined that Sacred Heart was paying an unreasonable amount for its inhalation therapy program's administration. The decision was based on a comparison of other hospitals with the same number of beds or inpatient facilities. The

Chief Hearing Officer did *not* consider this a relevant comparison. We agree.

■ Plaintiff's inhalation therapy program serves both in- and out-patients. Moreover, if its program is qualitatively better or provides a broader range of services than the other institutions in its area, presumably it would have a higher proportion of inpatients under its care needing those services. Thus, the Chief Hearing Officer requested the Plan to resurvey the area and find institutions "similar in size, scope of services, utilization and other relevant factors," as the regulations provide. *Supra.* The results of that survey clearly show that plaintiff administered over four times as much therapy as its closest competitor. *See* note 6, *supra.* Moreover, while the gross percentage cost of administration for each procedure was nearly 21%,[8] the administrative cost per procedure was within 4¢ of the two lowest institutions and half that of the third. Further, Sacred Heart's total cost per procedure was less than $1.00 and a full one-third of any of the other costs. Based upon this low cost per unit, the Chief Hearing Officer found plaintiff's costs quite reasonable. We find this conclusion to be in accordance with relevant law.

First, the statute presumes that a provider will be reimbursed for its actual costs unless they are unreasonable. Through its regulations, HEW has provided that it will reimburse providers for actual costs "however widely they may vary from one institution to another," 42 C.F.R. § 405.451(c) (1979), unless the institution's costs are "substantially out of line with other institutions in the same area which are similar in size, scope of services, utilization, and other relevant factors." *Id.* As we read this latter phrase, its intent and effect are to perform what amounts to a *rough* averaging. Comparing the gross administrative costs of a hospital performing 10 inhalation therapies a year to one performing 10,000 will always make the latter's costs look high. By comparing hospitals with, for example, 9,500 treatments per year in one and

10,000 per year in the second, the Plan accomplishes the same rough result as averaging. Since a hospital's costs must be "substantially out of line" with another hospital's to be refused, the regulations do not seem to be demanding perfect comparisons.

In this case, there were no institutions within the area with similarly sized inhalation therapy departments. Consequently, the Chief Hearing Officer, in order to meet the mandate of comparing similarly sized institutions, averaged the costs. Such a procedure was clearly contemplated by the statutory provisions, 42 U.S.C. § 1395x(v), and is within the plain meaning of the regulations.

Moreover, the Chief Hearing Officer had other information supporting his decision. When the Plan widened the geographical scope of its survey, it found hospitals in the Philadelphia area with similarly sized inhalation therapy programs. The administrative costs for those two programs were roughly $32,000 and $64,000 per year. Plaintiff's $56,000 per year cost is clearly reasonable when viewed within these bounds. Where such specialized programs are involved, the concept of "area" within the regulations seems, of necessity, flexible. A skilled heart surgeon's "area" may be the entire East Coast, whereas it is the local county for a family physician. Thus, from the evidence before us, comparing plaintiff's department to Philadelphia hospitals would have been permissible.

The "bottom line" figure in this case also provides support for the Chief Hearing Officer's conclusion. We consider the regulation's general allowance of costs "however widely they may vary," to allow providers some economic flexibility in administering their programs. No matter how defendant may complain that administrative costs here were fixed at 15%, the ultimate cost to the consumer was ⅓ that of any other institution. Obviously Sacred Heart's choice in organization structure worked. While the Plan does not have to prove these costs were out of line, *see Gosman v. United*

---

**8.** As indicated previously, the parties earlier agreed that 25% of these administrative costs represented patient services and were separate-

ly reimbursable. Thus, 75% of the figures in the table are the correct figures.

*States*, 573 F.2d 31, 215 Ct.Cl. 617 (1978), it does so at the risk that a hearing officer may find its position untenable.

Finally, after BHI reopened the case, plaintiff provided (in our opinion) significant, unrebutted testimony by a certified public accountant that the only valid comparison of these administrative costs was on a per unit basis. Taking all these factors into account, we cannot find the Chief Hearing Officer's original decision, overruling the Plan's determination that plaintiff's administrative costs were unreasonable, improper under the statute and regulations.

BHI is only allowed to reopen and reverse a hearing officer's decision if that decision is inconsistent with the "applicable regulations or general instructions." 42 C.F.R. § 405.1885(b) (1979). Since we consider the Chief Hearing Officer's decision to be in accordance with the regulations,[9] BHI had no legal grounds upon which to reopen the case and order revision.[10] Thus, the Chief Hearing Officer's original decision must stand.

Accordingly, upon consideration of the parties' submissions and after oral argument, plaintiff's motion for summary judgment is granted and defendant's motion for summary judgment is denied. Plaintiff is entitled to recover administrative costs for its inhalation therapy program for the years 1967–73 as originally determined by the hearing officer. Judgment is therefore entered for plaintiff in the amount of $69,-914.00.

---

**9.** *See Faith Hospital Ass'n v. United States*, 585 F.2d 474, 482, 218 Ct.Cl. ——, ——, n. 9 (1978).

**10.** BHI based its decision, in part, on the failure of the hearing officer to use its "prudent buyer" policy contained in the Provider Reimbursement Manual (HIM–15) § 2103. We have previously determined that the "prudent buyer" rule is a legitimate interpretive regulation. *See Gosman v. United States*, 573 F.2d 31, 215 Ct.Cl. 617 (1978). In certain instances, however, we have found Provider Reimbursement Manual provisions to be arbitrary and capricious. *Ami-Chanco, Inc. v. United States*, 576 F.2d 320, 217 Ct.Cl. 76 (1978). We are somewhat troubled by BHI's reliance on § 2103 in this case and its seeming substantive use. Nevertheless, since we find the hearing officer's decision proper under the regulations and BHI's actions improper, we need not reach the issues surrounding the effect of § 2103 if it is more than, as defendant argues, interpretative. *See Faith Hospital Ass'n v. United States*, 585 F.2d 474, 482, 218 Ct.Cl. ——, ——, n. 9 (1978).