**FAITH HOSPITAL ASSOCIATION**

v.

**The UNITED STATES.**

No. 532–78.

United States Court of Claims.

Sept. 10, 1980.

Alan C. Kohn, St. Louis, Mo., attorney of record for plaintiff. Kohn, Shands, Elbert, Gianoulakis & Giljum, Terry Lueckenhoff, St. Louis, Mo., of counsel.

Alexander Younger, Washington, D. C., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D. C., for defendant. David B. Palmer, Dept. of Health, Education, and Welfare, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and DAVIS, NICHOLS, KASHIWA, KUNZIG, BENNETT and SMITH, Judges, en banc.

### ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

KUNZIG, Judge:

This difficult and complex Medicare case deals with the appropriate allocation of

---

costs for Faith Hospital's ancillary services departments–anesthesiology, cardiology, pathology and radiology–concerning hospital–based physicians. Once more, it involves this court in the application and interpretation of the Secretary of Health, Education, and Welfare's (HEW)[1] troubled regulation[2] 20 C.F.R. § 405.486 (1973).[3] Upon review of plaintiff's fiscal year end reports, defendant, acting through the fiscal intermediary, Blue Cross Association, determined that plaintiff made a profit from treating Medicare patients and defendant withheld sufficient funds from current reimbursement to recapture that profit. Plaintiff claims a refund of that money. For the reasons stated below, we hold for plaintiff.

## I

## BACKGROUND

### A. *Medicare Provisions*

Plaintiff is a qualified provider of services under the Medicare Act. 42 U.S.C. § 1395x(u) (1976). To qualify, Faith Hospital is required by HEW to provide pathology and radiology departments. 20 C.F.R. §§ 405.1028–29. Anesthesiology departments are not required, but their operation is also governed by regulation if present. *Id.* at § 405.1031. As a qualified provider, HEW is obligated to reimburse Faith for the reasonable cost of covered services provided to Medicare beneficiaries.[4] 42 U.S.C. §§ 1395x(v), 1395cc. This entire statutory scheme is detailed in Part A of the Medicare Act. *Id.* at §§ 1395c–1395i.

Part A "provides basic protection against the costs of hospital and related post–hospital services." *Id.* at § 1395c. As mentioned, qualified providers of services are entitled to reimbursement based on the reasonable cost of providing services. *Id.* at § 1395f(b)(1). Rather then seek reimbursement directly from HEW, most providers elect a fiscal intermediary such as Blue Cross Association to provide interim payments and make final year end adjustments to conform payments to the requirements of the Medicare Act.[5] *See Pasadena Hospi-*

1. Of course, since this case was instituted the Department of Health, Education, and Welfare has been split into the Department of Education and the successor department for this case, the Department of Health and Human Services (HHS). Rather than change reference to HHS, we shall continue to refer to HEW, the relevant agency throughout the events in question.

2. This same regulation has been the subject of several other court cases including this court's prior case, *Faith Hospital Ass'n v. United States*, 218 Ct.Cl. 255, 585 F.2d 474 (1978), a First Circuit case finding a portion of the regulation arbitrary and capricious, *Hospital San Jorge v. Secretary of Health, Education, & Welfare*, 616 F.2d 580, 3 CCH Medicare & Medicaid Guide ¶ 30,341 (1st Cir. 1980), and the Fifth Circuit's later vacated case *Dr. John T. Mc-Donald Foundation, Inc. v. Mathews*, 534 F.2d 633, *reh. den.*, 554 F.2d 714, *vacated on jurisdictional grounds* in 571 F.2d 328 (5th Cir. 1978) *and transferred to the Court of Claims, Dr. John T. McDonald Foundation, Inc. v. United States*, No. 270–78 argued April 1, 1980, *pending decision. See also Lodi Memorial Hospital v. Califano*, 451 F.Supp. 651 (D.D.C.1978). *But see Vallejo General Hospital v. Weinbur-*

*ger*, 1977 CCH Medicare & Medicaid Guide Transfer Binder ' 28,373 (No. C–75–1444 Feb. 9, 1977).

3. During the time period involved in this case, 1970–73, the regulations under consideration were contained in 20 C.F.R. Due to a reorganization of the regulations, they are now located at 42 C.F.R. The reorganization was, generally, not substantive, thus reference to the regulations may be to the current printings in 42 C.F.R. as well. *See also Sacred Heart Hospital v. United States*, 222 Ct.Cl. ——, ——, 616 F.2d 477, 479, n. 1 (1980).

4. Generally, those over 65 are automatically entitled to benefits. Certain other groups and status qualify for benefits. *See* 42 U.S.C. § 1395c.

5. As the Sixth and Tenth Circuits have noted recently, "[T]he intermediary determines the amount due to the provider and makes payment accordingly. It thus acts as a field service for the Secretary." *Himmler v. Califano*, 611 F.2d 137, 140 (6th Cir. 1979) *citing Martinez v. Richardson*, 472 F.2d 1121, 1123 (10th Cir. 1973). As we ourselves have noted, this

*tal Ass'n Ltd. v. United States*, 223 Ct.Cl. ——, 618 F.2d 728 (1980). All Part A reimbursements are made from the Federal Hospital Insurance Trust Fund, 42 U.S.C. § 1395i (1976), which is funded from self–employment and employee wage taxes. *Id.* at § 1395(a)(1)–(2).

As we have explained before, the Medicare Act has a second program complimenting Part A. *See Faith Hospital Ass'n v. United States*, 218 Ct.Cl. 255, 585 F.2d 474 (1978). The complimentary program, Part B, 42 U.S.C. §§ 1395j–1395w (1976), is a supplementary insurance program covering physician and related health services. Generally, those covered by Part A are eligible to enroll under Part B.[6] Eligible individuals are required to enroll and make periodic premium payments. *Id.* at §§ 1395p, 1395s.

Physicians treating Part B beneficiaries are entitled to payment based on their reasonable charges, *id.* at § 1395*l*, rather than costs. Obviously, this is to allow doctors a professional fee generating personal income. Rather than pay the physicians directly, the Secretary is empowered to contract with carriers[7] to administer the Part B benefits. *Id.* at § 1395u. Thus, a physician is paid, audited and reviewed by the carrier acting on behalf of HEW. Ultimately, Part B benefits are paid from the Federal Supplementary Medical Insurance Trust Fund. *Id.* at § 1395t. This Part B trust is funded by the patient premiums and matching general federal revenue funds. *Id.* at §§ 1395s, 1395t.

Normally, no significant problem is encountered in determining whether costs of medical services to Medicare patients fall under Part A or B. For instance, a doctor operating out of his private office incorporates into his reasonable charge an amount to pay overhead, employees and provide the doctor's "profit" or income element. Since reasonable charges are a function of the locality's customary charges, a physician paying less rent than another may get more income from his Medicare reimbursement. Thus, some play exists in the Part B reimbursement due to the allowance of profit that does not exist under Part A which only reimburses for reasonable cost.

A problem exists, however, when dealing with hospital–based physicians. When a physician performs professional services under an agreement with a hospital, some degree of intermingling of costs exists and a method is needed to allocate costs between Part A and Part B. A set of examples may best illustrate the difficulties extant in such relationships.

Assume a radiologist has an agreement to perform professional services for a qualified provider–hospital as required by the Secretary. 20 C.F.R. § 405.1029. In the first case, also assume that all the radiologist does is walk into the hospital, operate the X–ray machine and read the developed negative. The hospital owns all the equipment, provides the supplies, equipment and personnel. Seemingly, the doctor's medical services consist entirely of a professional fee allocable to Part B. In turn, all the operating costs are borne by the hospital and should be allocated to Part A on a pro rata basis.[8]

Next, suppose the radiologist performed the services in his own office, the professional fee and all operating costs would be allocated to Part B.

makes the intermediary essentially an agent of the Government–the perennial defendant in our court. *Overlook Nursing Home, Inc. v. United States*, 214 Ct.Cl. 60, 63, 556 F.2d 500, 501 (1977).

6. Eligible individuals are defined in 42 U.S.C. § 1395*o* (1976) as those entitled to Part A benefits or citizens or certain resident aliens age 65 or older.

7. Carriers are for Part B basically the equivalent of fiscal intermediaries for Part A. Thus,

they are also essentially agents of the Government for Medicare administration. *See* note 5, *supra*.

8. By statute, Medicare only pays for costs allocable to Medicare patients. 42 U.S.C. § 1395x(v)(1)(A)(i) (1976). Thus, assuming both non–Medicare and Medicare patients utilize a department, the costs associated with that department must be allocated on a proportionate basis.

Finally, suppose the radiologist brings a laboratory technician and some film but the hospital supplies all else. The doctor's charge is once more covered by Part B. But two problems exist. First, if reasonable charges are community based and uniform, the hospital–based doctor receives a windfall from Medicare vis–à–vis the private practitioner. In other words, since the hospital–based doctor theoretically, had all his costs paid for by the hospital, he nets more money than a private doctor charging the same amount but paying his own costs. Thus, a means of separating out and adjusting the professional fee component of a hospital–based physician is needed. Second, where the physician works through a hospital, a means of allocating the costs each bears to the correct program must be devised. In the case at bar, we are concerned only with the latter cost allocation problem, but it is confused by interrelationship with the charges problem.

The Secretary's answer to the hospital–based physician cost allocation and charge adjustment problems is contained in 20 C.F.R. § 405.486. Generally, the regulation makes its decision on the basis of whether the physician or hospital bills the patient and whether the physician bears any operating costs. One overall goal of the regulation is to bring about as little change as possible in the net income the doctor receives for his professional services rendered in the hospital. Basically, the regulation, re–printed in full below,[9] provides that

---

**9.** § 405.486 *Effect of physician's assumption of operating costs.*

(a) *Principle.* Where a hospital–based physician himself bears some or all of the costs of operation of a hospital department and bills his patients directly rather than through the hospital, the reasonable charges for his services recognized under the supplementary medical insurance program will reflect the costs so borne by him. Where all the costs are to be borne by the physician, charges heretofore established for such services by agreement between the physician and the hospital may be acceptable as reasonable charges for purposes of the supplementary medical insurance program, but they will require adjustment either upward or downward if the hospital has been bearing a cost significantly greater or less than its share of the proceeds of such charges.

(b) *Billing for physician services.* (1) The objective in determining reasonable charges where the physician bills patients directly is the same as that expressed in § 405.485(a); to bring about as little change as possible (in the normal case) in the compensation the physician receives for his services in the hospital. Where the physician bills the patient directly, costs of operating the hospital department which are borne by the physician will be reflected in his reasonable charges which are compensable under the supplementary medical insurance program; the hospital will receive reimbursement through the hospital insurance program for those costs, if any, which it incurs. Where, however, a hospital initially pays some or all of the operating expenses of a hospital department (e. g., pays the salaries of nonprofessional personnel and purchases supplies and equipment), even though subsequently those items and services for which it pays the operating expenses are furnished for the use of the physician in return for an agreed upon payment by the physician to the hospital, such operating costs are reimbursable under the hospital insurance program as hospital costs, and are not to be reflected in the reasonable charges of the physician. Any payments received by the hospital under such an arrangement shall be treated as a reduction of allowable costs of the hospital reimbursable through the hospital insurance program.

(2) Where a hospital has been receiving, as its portion of the receipts for such services, significantly more or less than the costs the hospital has incurred in the provision of the services, this excess or shortage should not be transferred from the hospital to the physician merely because he decides to bill his patients directly. Since payment to the hospital is made on the basis of its reasonable costs for all hospital services, the transfer of such excess or shortage to the physician necessarily would alter the total cost of patient hospital and medical care–a result which the legislation was not intended to bring about. The reasonable charges of a physician who enters into a lease or similar arrangement with a hospital under which the physician assumes the costs of operating the department and bills the patients directly would be based upon the remuneration he received for his services immediately prior to the leasing arrangement plus his reasonable costs of operation, taking into account the hospital's cost experience in providing such services. Reasonable charges, so determined, would be subject to appropriate future adjustment to take into account changing economic factors. Reference back to the remuneration formerly received by the physician from the hospital as a factor in determining his reasonable charges under the lease or similar arrangement is required to give effect to the provisions of the statute which direct that consideration be given, in determining reasonable charges, to

where a physician 1) bills his patients directly and 2) bears some of the operating expenses, then his reasonable charges are to reflect the operating costs he bears.[10] Part A will pay any operating costs incurred by the hospital. The regulation goes on, however, to make an exception to this rule for those operating expenses which the hospital "initially" incurs. Reimbursement for operating expenses initially incurred by the hospital are to be reimbursed by Part A and not included in the doctor's reasonable charge. Furthermore, if the physician subsequently "repays" the hospital for such costs, the hospital must offset the amount received against Part A costs generally. Because the transfer of costs to the physician can alter the total medical cost to the patient, an arrangement shifting the profitability to the physician (who can insulate these operating costs in his reasonable charge) is not permitted. Thus, under this complicated, confused regulation there may be a constant necessity for adjustment of both charges and costs.

## B. Faith Hospital's Attempted Compliance

### 1. Pre-Medicare Arrangement

Prior to Congress' adoption of Medicare, Faith Hospital had ancillary services departments utilizing hospital–based physicians. In essence, the hospital operated the departments. It paid the employees, purchased equipment and supplies, and billed the patients. The physicians received a percentage of the gross billings and the hospital thus absorbed the bad debts. Throughout this period, however, the physicians negotiated for the right to bill their patients directly.

### 2. 1966–1969 Arrangement–Faith I

During the period 1966 to 1969, plaintiff and its hospital–based physicians rearranged their relationship, unfortunately, even more confusedly. During that period, examined fully by this court in Faith Hospital Ass'n v. United states, 218 Ct.Cl. 255, 585 F.2d 474 (1978), in plaintiff's terminology, the hospital "leased" the departments to the doctors. The hospital, however, still hired and paid the employees, purchased supplies and owned the equipment. The billing arrangement was also modified. Seemingly to come within the proscription of 20 C.F.R. § 405.486 that a doctor "bill his patients directly," bills for physicians' services were sent to patients on the physician's letterhead. Nevertheless, patients were to pay the doctor's group or Faith as collection agent. As apparently intended, most payments were made to Faith which deducted a substantial portion to cover operating costs. A fixed percentage of the billing was then paid the physicians for the value of their services. From the remainder, Faith took a "donation" which it applied to reduce hospital costs. The hospital continued to bear the risk of bad debts.

Upon review, HEW concluded that Faith, rather than the physicians, operated the departments. Moreover, the arrangement was designed by use of the donative element to allow the hospital to recapture profit which could be insulated in the doctor's charges. In reviewing that decision, this court upheld the Secretary. As Judge Bennett's opinion aptly points out, however, despite their attempt, the hospital and physicians failed to bring their arrangement under the regulations.[11]

---

the customary charges generally made by the physician for similar services. Where no pattern of customary charges has been established for the physician's professional services to patients other than the compensation he received from the hospital for his services, such compensation would serve as the basis for establishing the customary charge.

10. As to charges, if the physician bears all the costs, previously established charges may be acceptable for Part B reimbursement but re-

quire adjustment if the provider had been bearing a significantly different share of the costs.

11. For instance, while patients were billed in the doctor's name, in reality, all costs of billing were absorbed by the hospital including bad debts. Also, the hospital hired the employees, provided supplies, owned the equipment and incurred the overhead. Moreover, the doctors' donations were not properly treated as charitable contributions. Faith I, supra at 266–67, 585 F.2d at 480–81. See also discussion infra, part III.

3. 1970–1973      Arrangement–Instant Case

Given the difficulties encountered with HEW for the 1966–69 arrangement, Faith Hospital and the ancillary department physicians again modified their agreement. It is this arrangement utilized for the 1970–73 cost years which provides the basis of the dispute before us.

Faith Hospital met with its ancillary department physicians, Part A fiscal intermediary (Blue Cross Corporation), Part B carrier (General American Life Insurance Co.), and HEW representative to devise an arrangement, to meet the requirements of 20 C.F.R. §§ 405.480–405.487. The new arrangement which these parties developed substantially reorganized the responsibilities for the departments.[12]

As part of this new arrangement, the physicians in the four ancillary services departments formed Medical Professionals Services Corporation (MPS). MPS was made responsible for hiring the departments' employees and procuring necessary supplies. Faith, however, still owned the equipment and physical structure as well as providing utilities, maintenance and absorbing depreciation on the equipment and building. Since § 405.486(b)(1) prohibits the physicians from including in their reasonable charges any costs which the hospital initially pays, e. g., utilities, MPS set up a $5,000 revolving fund to insure that MPS paid all costs "initially" rather than the hospital.[13]

The second new feature of the 1970–73 arrangement involved the complete bifurcation of the billing of ancillary services departments' patients. As noted above, for a physician to include costs in his reasonable charges, he must bill his patients directly. 20 C.F.R. § 405.486(a). Consequently, MPS now bills all Medicare patients for the physicians. The costs of accounting, auditing and bad debts for Medicare patients are all borne by MPS (the doctors). For non–Medicare patients, however, MPS bills the patients indirectly (i. e., MPS bills the hospital which then, in turn, bills the patients). The reason given for this division is that Blue Cross objected to physicians billing non–Medicare patients directly due to private insurance considerations.[14] It is the utilization of this bifurcated billing device which, in the Secretary's opinion, funneled an alleged profit to plaintiff. The Secretary disapproved, citing 20 C.F.R. § 405.-486(b)(1).

**12.** Faith Hospital argued that the participation of the carrier, intermediary and HEW in devising this new arrangement should estop the Government from objecting at this stage. While we sympathize with plaintiff's continued frustration despite attempted compliance, we are troubled as to whether these agents could have bound the Government. *See Airmotive Engineering Corp. v. United States*, 210 Ct.Cl. 7, 535 F.2d 8 (1976). Due to the result we reach, *infra*, however, that argument need not be addressed.

**13.** The individual physicians utilized this same technique in 1966–69 in attempting to avoid the regulation's "initially pays" language. *Faith Hospital Ass'n v. United States*, 218 Ct.Cl. 255, 266, 585 F.2d 474, 480 n.7 (1978).

We agree with the prior court that this $5,000 revolving fund does not perform its intended function. The hospital obviously had primary liability for the utilities, maintenance and depreciation. The payments from the revolving fund were no different from rental payments except that they attempted to anticipate the costs. The Fifth Circuit's opinion in *Dr. John T. McDonald Foundation, Inc. v. Math-*

*ews*, 534 F.2d 633, 637 (5th Cir. 1976); *reh. denied* 554 F.2d 714, (5th Cir. 1977) *vacated on jurisdictional grounds* 571 F.2d 328 (5th Cir. 1978), would support plaintiff's position. That court read "initially pays" to refer only to expenses predating the physician–provider arrangement.

**14.** The explanation which was provided at the hearing below involved several factors. First, since Blue Cross advertised its insurance as covering ancillary department services it needed to have the hospitals bill the patients. Otherwise, where the doctor bills the patient, the proper insurer is Blue Shield which many patients do not carry. Second, from the patients' and physicians' perspective, Blue Shield often pays less than Blue Cross and many commercial carriers will not reimburse for these services where the doctor, rather than the hospital bills. This latter explanation was provided before in *Faith I, supra* at 267–68, 585 F.2d at 481. While the previous court implies some doubts about this reason for bifurcation, defendant has yet to object to the explanation and it seems reasonable.

As we understand this complex billing scheme, MPS billed Faith for the physician services rendered at an amount less than that billed to Medicare patients. Faith then billed the non–Medicare patients the same amount MPS billed Medicare patients. The discount MPS provided was considered an unrestricted, voluntary donation by the physicians to the hospital.[15] That amount was treated as taxable income for the physicians. From the remainder of the non–Medicare patient receipts, an amount was deducted to offset those operating costs the hospital bore for Medicare and non–Medicare patients.[16] The rest of the money was given to the doctors to represent their professional compensation.

## C. Administrative Proceedings

Procedurally, this case began when the fiscal intermediary, Blue Cross, audited plaintiff's cost reports for 1970–73. See e. g., Sacred Heart Hospital v. United States, 222 Ct.Cl. ——, ——, 616 F.2d 477, 479 (1980). In reviewing the hospital's cost reports, the intermediary disallowed reimbursement for items such as employee pension benefits, cafeteria costs, officer annuity purchases, executive salaries and other issues. The Blue Cross Association's Pro-

vider Appeals Committee conducted a hearing on these various issues in 1977. The majority opinion was generally favorable to plaintiff. For instance, they found the doctor's donations voluntary and unrestricted. All told, at this stage, all issues but the instant one have been resolved in plaintiff's favor.

As to the instant issue, the Chief Hearing Officer dissented and considered 20 C.F.R. § 405.486 and Provider Reimbursement Manual § 2108.5 HIM–15 to require the hospital to offset its ancillary services department's excess of revenues (including the doctor's donations) over costs against remaining ancillary services costs and then general hospital costs. Upon review, the Secretary adopted this latter minority position.[17]

## II

## PARTIES' POSITIONS

Adapting the conduit theory rejected in Lodi Memorial Hospital v. Califano, 451 F.Supp. 651, 656–57 (D.D.C.1978), and dicta from Faith I elevating substance over form,[18] defendant argues that a realistic

---

15. By contrast, the donations at issue in Faith I were treated inconsistently with their characterization as charitable donations by the physicians. Supra at 266–67, 585 F.2d at 480–81. In this case, the Government is not contesting the donations directly. See also PRRB Decision No. 78–D33 1978 CCH Medicare Guide Transfer Volume ¶ 29,181 (May 19, 1978), aff'd by Administrator, 3 CCH supra at ¶ 29,241. "[I]f physicians . . . chose to donate a sum for the unrestricted use of the Hospital, there would be no offset required by the Medicare program." Id.

16. At the hearing, plaintiff explained that Blue Cross felt there was no need to shuttle funds to pay expenses. Rather this deduction from non–Medicare patient reserves would adjust the costs. Moreover, a year–end adjustment was also performed. While defendant finds this arrangement inherently suspect, there is no reason that the doctors could not pay the Medicare patient costs by receiving less compensation themselves for professional services, in a sense, for non–Medicare patients. If done properly, the physician should receive the same net income as if billing and cost allocation was done separately.

17. The other hearing officers would have remanded the issue to the Bureau of Health Insurance for clarification.

18. The concept of looking at the substance of an arrangement rather than its form is a well established tax principle. See 8 Prentice Hall Federal Taxes ⸍ 41,000 (1980). The reason is that tax is an "intensely practical" matter. 1 Mertens, Law of Federal Income Taxation, § 3.04 (1980). See also, Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935). While this concept is undoubtedly useful in Medicare cases, we are not as certain of our power to introduce such a concept into our jurisprudence given our limited review for Medicare cases. See e. g., Moody Nursing Home, Inc. v. United States, 223 Ct.Cl. ——, 621 F.2d 399 (1980). While we must review the administrative decision to determine if it was supported by substantial evidence, Faith I was not required to inquire into the substance of the arrangement since it failed to comply with the regulation in form alone. We thus leave for another day the difficult question of whether we may utilize the useful tax concept of substance over form for Medicare purposes.

appraisal of Faith's arrangement shows that profits earned on non–Medicare patients are really earnings attributable to Medicare patients. The crux of defendant's objection is to 'MPS' charging Faith Hospital less for non–Medicare patients (the donation) and deducting the operating costs for the *entire* department from non–Medicare patient earnings (rather than paying the Medicare patient's share from Medicare patient earnings). The Government argues that the physician receives more than his normal compensation when treating Medicare patients under Faith's arrangement (made in attempted compliance with the regulation) and effectively makes a non-cash transfer to Faith of this excess profit by taking less than normal compensation for non–Medicare patients. Thus, defendant concludes, if the doctor simply charged both classes of patients equally, Medicare would pay less and Faith's profit would be concomitantly reduced.[19] Boiled down to its bare bones, defendant complains that the doctors overcharged Medicare patients under Part B and now the Government seeks to recoup the overcharge by withholding Part A reimbursement from the hospital.

Plaintiff, on the other hand, argues that it is entitled to reimbursement. First, following the First Circuit's recent decision in *Hospital San Jorge v. Secretary of Health, Education, & Welfare,* 616 F.2d 580, 3 CCH Medicare and Medicaid. Guide ¶ 30,341 (1980), plaintiff argues that the regulation is arbitrary and capricious. Following the First Circuit's opinion, plaintiff contends that the regulation is internally inconsistent and, additionally, fails to adhere to Congress' statutory scheme. Since the regulation is invalid, it is incapable of supporting defendant's withholding of reimbursements to which plaintiff is otherwise entitled.

Alternatively, plaintiff contends that, if the regulation is valid, Faith has complied with it and is likewise entitled to reimbursement. For 1970–73, the doctors, as the regulation requires, operated the departments, hired the employees, furnished supplies and billed the patients. Thus, the doctors could properly charge as they did. Moreover, the hospital did not "initially incur" any operating expenses because of the $5,000 revolving fund. Finally, plaintiff did all it could to comply with the regulation, meeting with the intermediary, carrier and HEW representative who agreed to Faith's arrangement. Consequently, they continue, defendant should be estopped from arguing the validity of the arrangement.

But plaintiff's strongest and most pragmatic point is that the reasonableness of the doctor's charges has already been established for Part B[20]–for the same doctors, the same patients, the same hospital and the same Medicare program. Defendant cannot now reargue the reasonableness and recoup any overcharge from the hospital under Part A. Put simply, the Government cannot have it both ways.

We sympathize with both parties in this case. The Secretary has the unenviable ask of ensuring payment from the proper Medicare fund. It is also apparent that manipulation of Part A and Part B may cause HEW and patients to pay higher medical costs. Nonetheless, plaintiff and the doctors are entitled respectively to recapture their costs and make a living. Moreover, plaintiff has gone to great lengths to comply with the Secretary's regulation, even securing approval from HEW, the intermediary and carrier for its arrangement. Now, much later, the hospital learns from the same intermediary, carrier and Government that the arrangement is *not* in compliance and the hospital will lose substantial sums of money. Given our previous cases, a careful review of the record and relevant law, we must hold for plaintiff.

### III

### ANALYSIS

As noted above, the Secretary relies entirely on 20 C.F.R. § 405.486 to recapture

19. *See* note 16, *supra.*

20. The Part B carrier has already approved and paid the doctors. Government counsel informs

us that the time to review these charges has passed and we note the Government's failure to contest their reasonableness.

alleged overpayments to the plaintiff. The overriding problem with this regulation, however, is that it attempts to authorize the Secretary to recoup Part B *doctor* overcharges from the *hospital's* reimbursements. But entitlement to hospital reimbursement is determined under Part A. No statutory authority is provided to support such a unique proposition and, in fact, Congress' statutory scheme seems to prohibit such indirect recapture. Moreover, the regulation, as the First Circuit recently held in *San Jorge*, is internally inconsistent.

Initially, we would note some distinctions from our prior *Faith I* opinion. Although there are similarities between the two cases, as detailed *supra*, each case involves a different factual setting. Of particular importance is the fact that the involuntary "donations" which *Faith I* found offensive are voluntary and unrestricted in our case. *See* note 15, *supra*. In this case, it is the manner in which operating costs were paid that causes HEW's concern and the donations are only indirectly involved. Moreover, in *Faith I* plaintiff made no attack on the Secretary's power to issue the regulations nor the regulation's validity. Since plaintiff did not challenge the regulation, the court was not required, as we are, to examine the validity of 20 C.F.R. § 405.486. Finally, we would note that *Faith I* only held that plaintiff failed to bring itself within the terms of the regulation. Because plaintiff did not question the regulation but instead argued its compliance stressing the favorably narrow reading of *Dr. John T. McDonald Foundation, Inc. v.*

*Mathews*, 534 F.2d 633 (5th Cir. 1976), *reh. den.*, 554 F.2d 714 (5th Cir. 1977), *vacated on jurisdictional grounds*, 571 F.2d 328 (5th Cir. 1978), *and transferred to Court of Claims, Dr. John T. McDonald Foundation, Inc. v. United States*, No. 270–78, argued April 1, 1980, *pending decision*, it acquiesced in the Secretary's withholding or reimbursement.

As the First Circuit recently noted in *San Jorge*[21], the Secretary has no direct authority to make adjustments to reimbursements based on who bears the cost, but must rely on his general authority to adopt regulations, 42 U.S.C. § 1395hh (1976), and his specific authority to determine the allowance of the hospital's reasonable costs, *id.* at § 1395x(v)(1)(A), and a physician's reimbursable charges, *id.* at § 1395f(b), none of these sections support the regulation as written.

First, as Judge Wyzanzki wrote in *San Jorge*, "The Secretary has no statutory power to limit medical costs but only to limit reimbursement of costs." *San Jorge supra* at 586, 3 CCH at 9241. Yet, defendant's real complaint is that Faith's arrangement is causing overly high medical costs and, in fact, the specific cost of which the Secretary complains is to the doctor's charge under Part B that has already been approved and paid. The Fifth Circuit was correct in stating:

> As now written, the regulation does not permit the Secretary to snatch revenue from the [doctor] out of the hospital's

---

**21.** The doctor–hospital lease arrangement in *San Jorge* was similar to ours. The radiologists supplied certain equipment, supplies, employed the personnel and billed all Medicare or insured patients. The hospital provided space, utilities, janitorial services and billed all other patients. *Id.* at 584, 3 CHH at 9238. The doctors paid the hospital a percentage of gross revenue as rent. HEW offset the rent received first against the hospital's radiology department costs and then, under the authority of 20 C.F.R. § 405.486(b)(1), against general hospital costs reimbursable under Part A. Plaintiff challenged the Secretary's authority to offset these costs and the court found the doctors were entitled to include operating costs in their charges.

We cannot merely follow the reasoning of the First Circuit for two reasons. First, factually, *San Jorge* involved a direct leasing arrangement far less involved than what we face here. The reduction in charges and separation of costs was a single step process and did not require the direction we find lacking. *Infra*. Second, the court in *San Jorge* only needed to invalidate the third sentence of § 405.486(b)(1) disallowing the inclusion of costs in doctor's charges where the hospital "initially incurs" the costs. In our case, the problem is with the next sentence in the regulation which provides

> Any payments received by the hospital under such an arrangement shall be treated as a reduction of allowable costs of the hospital through the hospital insurance program.

pocket after the money has left the doctor's hands.

*McDonald, supra* at 639.[22]

Thus, we agree with the First and Fifth Circuits that the Secretary cannot come in the back door and recapture Part B overpayments to doctors by punishing the hospitals under Part A. Moreover, the Government offers no support for such a proposition.

Judge Campbell, concurring in *San Jorge*, also found this defect troublesome, stating:

[I] find it particularly significant that the Secretary nowhere justifies offsetting the hospital's leasing profit against its general costs as being a necessary or proper way to determine the hospital's "reasonable cost" of caring for Medicare A patients. *See* 42 U.S.C. § 1395x. Rather, the Secretary justifies the offset in terms of its being a kind of windfall profit tax related to presumed excessive Medicare reimbursement of radiologists under Part B. Had the Secretary offered rational justification for the offset in terms of his authority to determine "reasonable cost" under Part A, I would have gone a considerable distance to accept justification.

As the Provider Reimbursement Review Board (PRRB) correctly pointed out in analyzing a similar situation, the solution to the whole problem is not that difficult:

[T]he logical and equitable remedy rests in making the Part A Intermediary and Part B Carrier collaborate to determine and adjust, when necessary, the reasonable charge made by the physician group and to limit the payment by Medicare to the cost incurred by the Hospital in providing space and whatever services it provides to the physician group.

PRRB Hearing Dec. No. 78–D33, 1978 CCH Medicare Guide Transfer Volume ¶ 29,181 (May 19, 1978), *aff'd* by Administrator, CCH *supra* at § 29,241.

Second, the Part B carrier has already approved the physician's reasonable charges for purposes of that program. In fact, Government counsel advised the court at oral argument that defendant withheld funds from the Part A hospital because the time for reviewing the Part B charges has past. The government's failure to review the reasonableness of the Part B charges earlier should prevent the litigation of that issue now.[23]

---

**22.** As noted in *Faith I, supra* at 263, 585 F.2d at 478, since the Fifth Circuit vacated *McDonald*, it is of no precedential value. Nonetheless, it is certainly of persuasive value and instructive. Far more so, perhaps, than the scholarly articles upon which we frequently rely.

The *McDonald* case involved hospital–based radiologists with a lease from the hospital. The Fifth Circuit considered the regulation's only purpose to be the prevention of double billing. 534 F.2d at 637. Thus, the hospital and physician could not both charge Medicare for the costs of the department. Moreover, as quoted above, the court said the regulation would not authorize the Secretary to recapture excessive doctors' charges from the hospital. Faith has consistently argued the application of the *McDonald* case. As the hospital notes and the Government agrees, no double billing has ever existed under Faith's arrangement. Moreover, the Fifth Circuit's interpretation of the term "initially pays," 534 F.2d at 637, supports Faith's argument that its $5,000 revolving fund relieves the hospital of its obligations as far as the regulation is concerned. Finally, Faith has argued that the term "operating expenses" only included *direct costs of providing services.* Again, the *McDonald* court found the regula-

tion flawed in failing to sufficiently distinguish operating and overhead costs. *Id.* at 638. The *McDonald* opinion was followed nearly in full by the district court in *Lodi Memorial Hospital v. Califano*, 451 F.Supp. 651 (D.D.C.1978). *But see Faith I, supra*, at 263, 585 F.2d at 478 n.6. While *Lodi* may be deprived of some force, nonetheless, it is good law.

Defendant's position is supported by *Vallejo General Hospital v. Weinberger*, 1977 CCH Medicare & Medicaid Guide Transfer Binder ' 28,373 (N.D.Cal. Feb. 9, 1977).

**23.** The regulations provide that the carrier shall make an initial determination as to the reasonableness of a Part B charge. 20 C.F.R. § 405.-803. That determination "shall be final and binding upon the party or parties to such determination unless it is reviewed in accordance with §§ 405.810–405.812, or is revised in accordance with § 405.841." *Id.* at § 405.806. The first sections provide for a formal hearing, *id.* at §§ 405.821–405.835, or informal hearing. *Id.* at §§ 405.810–812. Under § 405.841, the decisions made above may be reopened upon motion of the parties, carrier, or hearing officer during a one year period following the decision. The Secretary's failure to follow his own regu-

Third besides providing no support for the proposition that Part B doctor overcharges can be recouped from the hospital, the Secretary is without any support for cavalierly treating Part A and Part B as one. Again, to quote from the First Circuit:

> [T]here is no ... connection between Medicare A and Medicare B as to furnish a proper basis for setting off an excess payment made by Part B against an otherwise reimbursable cost of Part A. Medicare A and Medicare B are two different programs which have different purposes and, in some degree, different agencies of administration. Payments of Part B claims come from the FSMIT Fund; payments of Part A claims come from a wholly different fund with wholly different beneficiaries. If the offset were allowed, there would be a totally unmerited enrichment of the Medicare A fund, without any mechanism for Medicare A to transfer the unmerited enrichment to the FSMIT Fund.

As we too have noted, *supra*, Congress set up two separate trust funds—one for Part A and one for Part B—separately paid for and administered. Thus, the Secretary has more than a nominal burden to overcome in showing why Congress intended to allow intermingling the trust fund monies and recapturing Part B overpayments from the hospital under Part A. That burden has not been met.

Fourth, the Secretary's regulation and its application seem to violate an overriding principle of the Medicare Act that the costs of Medicare patients' medical services not be borne by non–Medicare patients and *vice versa*. 42 U.S.C. § 1395x(b)(1)(A) (1976). The PRRB has also noted that the regulation improperly assumes that Part B overpayments correspond to Part A costs and mistakenly hypothesizes that any offset will proportionately benefit Medicare patients as required by statute. PRRB Hearing Dec. No. 78–D33, *supra*. For instance, in the case at bar, Faith has undisputedly off-

set general hospital costs by the amounts it received in alleged overpayments. No accounting for that fact appears on the record. Moreover, the setoff from Part A against Part B seems accomplished without the recognition that if more Medicare patients utilize Part B than Part A, then Medicare reaps a windfall contrary to 42 U.S.C. § 1395x(v)(1)(A).

Fifth, in addition to violating the statutory provisions, the regulation is internally inconsistent as the First Circuit recently held in *San Jorge*. As Judge Wyzanski noted, § 405.486(b)(2) allows a doctor to include operating costs in his reasonable charge and Part B will reimburse him. Yet, § 405.486(b)(1) prohibits the doctor from including these same costs if the hospital "initially incurs" them. Since (2) allows rental payments whereas (1) does not, the court found the regulation internally inconsistent. *San Jorge, supra* at 587, 3 CCH at 9241.

Sixth, perhaps the regulation's greatest shortcoming is that it fails to detail how to compute either the hospital's alleged profits or offset that amount against costs as it requires. Even defendant must hedge its argument by referring to Faith's profit as "theoretical."

> [A]n arrangement whereby the physician's compensation is taken disproportionately from Medicare patients and the hospital's profit is, *theoretically*, taken disproportionately from non–Medicare patients cannot be sanctioned. [Emphasis added.]

Finally, we are seriously troubled by defendant's continued reliance on hypotheticals utilizing *assumed variables* to prove its case. Nowhere, after an exhaustive review of the record, can we find any detailing of how Faith Hospital made a profit from this particular arrangement. While the hospital has the initial burden of proving entitlement, *see e. g., Gosman v. United States*, 215 Ct.Cl. 617, 624, 573 F.2d 31, 32, 36 n.4 (1978), that burden does not continue *ad infinitum*.

lations is inexplicable. It is Congress and the Secretary's fault if the statutes and regulations

do not give them sufficient leeway to review Part B determinations.

The morass into which plaintiff sank was partially due to attempted compliance with HEW's unsupported regulation. The exasperating factor here is that this entire problem and this case should not be the overly complicated problem it has become. The "fault" in this instance may also lie with the fiscal intermediary and carrier. As the PRRB stated in examining a similar situation:

> [T]his situation would never have existed had the Part A Intermediary and Part B Carrier followed the instructions provided in Sections 2108.5 and 2108.6 of HIM–15. The Board finds that if a physician has entered into an arrangement whereby the hospital is reimbursed more than its cost, then under the regulations there should be an appropriate adjustment of the portion of the physician's fee recognized as Part B charges and *not an indirect adjustment to the hospital's Part A reimbursable cost.* [Emphasis added.]

PRRB Hearing Dec. No. 78–D25 1978 CCH Medicare and Medicaid Guide Transfer Binder ¶ 29,018 (April 17, 1978). The problem could lie in the inherent conflict an insurer of both private and public medical funds possesses. Yet, Congress explicitly approved the use of private insurers as "field agents" for HEW. *See Himmler v. Califano,* 611 F.2d 137, 140 (6th Cir. 1979).

Despite our criticism of the present regulation, we recognize the difficulties facing the Secretary and a need to deal with the special problems concerning hospital based physicians. Thus, the Secretary should not read this court's opinion as precluding some rational method of handling these situations. *See also San Jorge, supra* at 589, 3 CCH Guide at 9242 (Campbell, J., concurring).

In summary, we hold the regulation relied on by the Secretary to withhold reimbursements to which plaintiff is otherwise usually entitled to be arbitrary and capricious for several reasons. The regulation is lacking in statutory support and, at least as applied, conflicts with the specific Congressional provision for two separate trust funds, 42 U.S.C. §§ 1395i, 1395t (1976), and the requirement that non–Medicare patients not pay Medicare cost. *Id.* at § 1395x(v)(1)(A)(i). Moreover, the regulation is, as the First Circuit also concluded, internally inconsistent. It also fails to explain how it should be applied. Defendant itself referred to plaintiff's profit as "theoretical" and needed to rely on hypotheticals replete with assumed, unsupported variables, to prove its case.

Because the Secretary had no grounds upon which to withhold the reimbursements to which plaintiff is entitled, judgment must be entered for plaintiff. *See Sun City Community Hospital v. United States,* 224 Ct.Cl. ——, 624 F.2d 997 (1980); *Sacred Heart Hospital v. United States,* 222 Ct.Cl. ——, ——, 616 F.2d 477, 484–85 (1980).

Accordingly, upon consideration of the parties' submission, extensive review of the administrative record, and after oral argument, defendant's motion for summary judgment is denied and plaintiff's motion for summary judgment is granted. The case is remanded to the trial division for determination under Rule 131(c).

DAVIS, Judge, with whom KASHIWA, Judge, joins, dissenting:

This is indeed a hard case, and I do not dissent without troubling doubts. But in the end I believe that the regulation can be upheld despite its obvious imperfections. Much that was said in *Faith Hospital Ass'n v. United States (Faith I),* 218 Ct.Cl. 255, 585 F.2d 474 (1978), is still applicable.[1] The only really new problem—not raised or discussed in *Faith I*–is that the regulation seems to enrich the separate Part A fund for overpayments attributable solely to Part B of Medicare (itself funded by a wholly distinct fund). The court here and the First Circuit in *Hospital San Jorge v.*

---

1. In that case the court did not restrict itself to the particular facts of the individual case, but held broadly that the hospital could not obtain reimbursement under Part A for the inclusion in the physicians' charges and payments to it of additional sums constituting a monopoly payment or profit to the hospital.

*Secretary of Health, Education and Welfare*, 616 F.2d 580 (1st Cir., 1980), find that to be an insuperable objection.

My contrary conclusion stems from some statements (with which I agree) of Judge Campbell in his separate opinion in *San Jorge*:

The Medicare legislation gives the Secretary broad powers to determine the reasonableness of charges. The Secretary is not at the mercy of hospitals and physicians who seek unwarranted reimbursement, and retains a large reservoir of express and implied power to adopt rational requirements that guard against waste and fraud. Such regulations may include reasonably based presumptions and policy determinations reflecting the Secretary's judgment as to what is required to make the program work. Here one can understand the difficulty that led to the present attempted solution. Even in an era of computers, it is probably impractical for the Part B intermediary to screen the radiologists' bills in terms of the leasing hospital's actual costs. The Medicare B intermediary is unlikely to have ready access to the hospital's books, and, even if it does, the practicalities disfavor effective utilization of this information in reviewing myriad individual bills which come from the physician, not the hospital. Such considerations led the Secretary into the present system, which catches the real villain (if there is one)—the hospital—at a time when its defenses are down and its books on the table. [*San Jorge, supra*, 616 F.2d at 590.]

In other words, it was not really feasible for the Part B carrier (or intermediary) to monitor the costs of each hospital-based doctor to see that he did not exceed his reasonable charge, or differentiate in his charges, so as to covertly give the hospital a regular profit. And, even more significantly, it is the hospital which participates in, and perhaps encourages, the arrangement by which it receives this special profit due to the Part B overcharge. The hospital is not a mere bystander with clean hands; it is, so to speak, *particeps crimini*—perhaps the leading participant.

Unlike Judge Campbell, I think that these factors enabled the Secretary to promulgate the regulation. Not that I consider that there is a direct connection between the regulation and the Part B funds, nor between the Part B overpayments and the regulation's Part A exaction. It is sufficient for me that the hospital-provider as the "real villain" has deliberately enabled the physicians to receive a profit to which they were not entitled, and has deliberately participated with the physicians in the latters' effort to receive that overpayment. The hospital was by no means innocent of the doctors' wrongdoing. To prevent the hospital from acting in this way, the Secretary could provide that, in that situation, the hospital's reasonable reimbursement under Part A should not include those overpayments which the hospital deliberately and improperly enabled the doctors to receive for themselves under Part B. It does not seem to me unreasonable or invalid for the Secretary to deduct from Part A reimbursement those excess payments the hospital intentionally and deliberately encouraged the doctors to receive through a scheme designed to have the latters' Part B patients overcharged. The hospital obtained a benefit from this arrangement which it fully accepted.

The Secretary had surveillance over Part B as well as Part A, and in the circumstances it was not beyond his province to call the provider to account (through Part A) for the latter's deliberate dereliction in enabling and encouraging a violation of Part B. The hospital need not remain scot-free for its own wrongdoing, and Part A is the most feasible vehicle for deterring and remedying that injury by the hospital. The Secretary's present method certainly has "rough edges," and leads to the enrichment of the Part A fund when the Part B fund has been more hurt, but the court's setting aside the regulation leads to the undue enrichment of the hospital and the doctors when they were both major participating culprits.

BENNETT, Judge, dissenting:

I must respectfully dissent and make two principal points. First, there has been some

confusion in this case which is perpetuated by the majority opinion, as to what the Government has conceded. The majority opinion describes the "donation" involved in this case as consisting of the difference between the amount plaintiff billed to non–Medicare patients and the amount plaintiff remitted to Medical Professional Services Corporation (MPS) from such billings. There was a second donation involved in this case. This second donation was given voluntarily by the doctors out of Medicare receipts paid to them by MPS after the deduction of costs incurred by MPS. It was the amount of the second donation, $113,240, which was originally contested and decided adversely to the Government by the Blue Cross Association's Provider Appeals Committee. Defendant does not contest this second donation, as noted in the majority opinion in footnote 15, *supra*.

Defendant does, however, contest the first "donation," and to the extent footnote 15 suggests otherwise, it is misleading. Defendant contends that the first "donation" was a sham and allows plaintiff to make an impermissible profit off Medicare. It was this "donation" that was the basis of the dissent of the Provider Appeals Committee and the final administrative decision by HEW. The amount at issue is approximately $780,000, which equals the revenue in excess of costs received by plaintiff from its charges to non–Medicare patients for services rendered in the ancillary departments.[1] The costs deducted by plaintiff were *all* overhead costs incurred in the support of the ancillary departments, *i. e.*, costs attributable to both Medicare and non–Medicare patients. It appears from estimates made by plaintiff's own counsel before the administrative hearing that as much as 75 percent of the amounts billed were retained by plaintiff either as costs or as a "donation." Plaintiff alleges that the revenue in excess of costs received on the non–Medicare billings was used to reduce the costs of Medicare patients. However,

plaintiff was still reimbursed in full for its Medicare costs without any reduction for the amount of these "donations." At most then, the only benefit that may have accrued to Medicare would be that Part A reimbursed less interest expense if plaintiff used the excess revenue to reduce the size of its debt.

In summary, plaintiff still retains "donations," which are actually profits, out of billings, just as it did in *Faith Hospital Ass'n v. United States*, 218 Ct.Cl. 255, 585 F.2d 474 (1978) (*Faith I*), and plaintiff uses the profits to "reduce" hospital costs no more here than it did in *Faith I*. The only difference is that the profits in one sense are deducted out of non–Medicare funds rather than Medicare reimbursements, but since plaintiff has commingled Medicare and non–Medicare funds by (1) paying all overhead costs out of non–Medicare funds and (2) arranging to take all of its profits out of non–Medicare funds while MPS takes a disproportionate share of its profits out of Medicare funds, the difference is merely formal. It does not matter out of which "pocket" plaintiff claims it is taking the cash. Under the rule of *Faith I*, the substance of the arrangement is controlling, not the form, and the court should hold that plaintiff is receiving an impermissible profit out of Medicare funds. 218 Ct.Cl. at 255, 268–69, 585 F.2d at 479, 481–82.

Second, the major basis for my dissent is that the court has misapprehended the nature of this case and has thereby been led into confusion. The court characterizes this case as involving an attempt to recoup Part B overcharges through Part A. Under this view, the agency appears to be impermissibly transferring Part B funds to Part A and this is part of the basis for striking the regulation. However, such "transferring" of funds is entirely theoretical and does not exist if the case is approached in different ways.

1. Since this amount is based on *net receipts* and not the gross difference between the amount billed by plaintiff and the amount remitted to MPS, the amount retained is profit and cannot be justified as necessary to cover services to MPS in billing and absorbing the bad debts of non–Medicare patients.

This case may with equal justification be approached as a Part A overcharge case, rather than a Part B overcharge case. MPS's charges were allowed by Part B and presumably were reasonable. If MPS had no relationship with the hospital, these very same charges would be perfectly legitimate and would not be considered Part B overcharges in any sense. However, MPS made payments to plaintiff which represented profit to the hospital. From the view of Part A, plaintiff did not actually bear its costs to the extent the costs were covered by MPS profit payments. *Faith Hospital Ass'n v. United States, supra,* 218 Ct.Cl. at 264, 268–69, 585 F.2d at 479–80, 482. Therefore, to the extent plaintiff failed to deduct the amount of the profit payments from its claims for Part A reimbursement, plaintiff made Part A overcharges. This "Part A" approach is the one utilized by the regulation which speaks in terms of reducing allowable Part A costs rather than recouping Part B overcharges. 20 C.F.R. § 405.486(b)(1) (1973). Under this Part A approach, the regulation does not intermingle the trust funds, plaintiff and MPS do. The actions of plaintiff and MPS provide no basis for striking the regulation. It must be observed that in the situation of the hospital–based physician, there are costs which are not per se Part A costs or Part B costs, but may with equal propriety be considered either. Therefore, there is no "intermingling" of funds by the regulation because reimbursement out of either trust fund would be valid.

This last observation leads to a second alternative approach to this case, the *Faith I* approach. *Faith I* did not treat this as an overcharge of either Part A or Part B in particular. Instead, it characterized this situation as an attempt by a provider to increase the amount of its total Medicare reimbursements, Part A and Part B, by engaging in an empty ritual, changing its form but not its substance. 218 Ct.Cl. at 264, 269, 585 F.2d at 479, 481–82. The regulation was held not to attempt to recoup Part B overcharges through Part A, but rather to secure *both* Medicare trust funds "against the use of trifling changes

in form to justify large changes in result." 218 Ct.Cl. at 264, 585 F.2d at 479. Under this approach there is again no transfer of trust funds from one Part to the other. The Secretary has discretion to deduct the excess in the claims for reimbursement resulting from the mere change in form under either Part.

If either of these alternative approaches is adopted, the entire basis and structure of the court's reasoning collapses. Since the various approaches are at least equally reasonable, and the regulation may be sustained under the two alternative views, those views should be adopted and the regulation upheld. However, as Judge Davis ably indicates in his dissent, even under the court's approach, the regulation should be upheld. The Secretary's method for preventing the unnecessary and improper depletion of the Part B fund is a reasonable one. Under the court's approach, however, in order to protect Part B from what is perceived to be the improper transfer of funds to Part A, the court allows the improper transfer of Part B funds to plaintiff. Even using the court's view of the case, the Secretary's action makes more sense than the court's.

On the above analysis, I would uphold the regulation and affirm the administrative decision. While I can sympathize with the view towards ridding the system of this ill–drafted and trouble–making regulation, there are other considerations. I would leave to the Secretary the decision of whether the benefits from this regulation warrant retaining it in its present form when weighed against its various disorienting effects with their consequent inefficiencies, expenses, and possibilities for undermining the system.